James Earl LAMB, Appellee,

v.

The MANITOWOC COMPANY, INC.
and Manitowoc Engineering
Co., Appellants.

No. 96–620.

Supreme Court of Iowa.

Oct. 22, 1997.

Rehearing Denied Nov. 25, 1997.

Patrick M. Roby and Christopher L. Bruns of Elderkin & Pirnie, P.L.C., Cedar Rapids, for appellants.

Jerry Wieslander, Altoona, and Donald G. Beattie and R. Bradley Skinner, Altoona, for appellee.

Considered by McGIVERIN, C.J., and HARRIS, LARSON, LAVORATO, and SNELL, JJ.

SNELL, Justice.

Plaintiff, James Earl Lamb, was awarded damages by a jury for injuries suffered in a workplace accident. The legal basis for the verdict was an alleged breach of defendants' duty to warn plaintiff of the danger in working with wire rope. The trial court denied defendants' motion for judgment notwithstanding the verdict. On appeal by defendants, we reverse and remand.

## I. Background Facts and Proceedings

James Earl Lamb was injured in an accident involving a crane designed and manufactured by defendants Manitowoc Company, Inc. and Manitowoc Engineering Company (hereinafter Manitowoc). Lamb was injured while helping two coworkers replace the wire rope, an integral piece of equipment on the crane. On cranes, the wire rope is wound tightly around a drum at the base of the crane. The rope then is strung up the boom of the crane and around a point sheave at the end of the boom. A hook or other device is then attached to the rope dangling from the point sheave to allow objects to be moved by the crane. Defendants did not manufacture or design the wire rope involved in the accident or the spool which held the new rope.

The wire rope must be replaced periodically because of wear and tear. When the wire rope on a crane is replaced, each loop of rope on the drum must be placed tightly next to the previous loop. If this is not done properly, a loop on the second layer of rope could be pulled into the gap, causing the rope to lose tension, which could injure a worker attempting to attach or detach a load from the rope. Tension must be applied to the rope during the winding process to ensure that it is tightly wound.

Lamb and his coworkers used a method of rope replacement approved by and regularly used by the foreman and contractor for whom they worked. Under this method, a spool of new rope was suspended off the ground by wire chokers. The new rope was then strung through the point sheave, down the boom of the crane, and secured to the drum. One worker was directed to stand at

the drum and hammer the loops of rope tightly into place. Lamb was directed to stand on the lowered boom of the crane several feet from the point sheave. From his position on the boom, Lamb was nearly ten feet off the ground. He wrapped a choker, made of a short piece of smaller diameter wire rope with fasteners on both ends, around the new rope, fastening one end to the boom and the other end to a metal sleever bar. The tightened choker created tension on the new rope as his coworkers wound the rope onto the drum. After several turns of the drum, Lamb noticed that the rope was wearing through the choker and signaled to his coworkers to stop the procedure. Lamb discussed how to proceed with one of his coworkers, who suggested that Lamb loosen the choker wrapped around the sleever bar to reduce tension and thus avoid breaking the choker. At that point, Lamb reached down to show the coworker the amount of tension that was on the sleever bar. When he touched the sleever bar, it came loose and tension on the rope was lost. The release of tension caused the rope to twist around Lamb's arm, causing severe injury to his forearm and hand. Lamb required extensive reconstructive surgery to repair the injuries.

The method of rope replacement used by Lamb and his coworkers was not the same method alleged by defendants to be the generally accepted method for rope replacement. Under the method advocated by defendants, the spool of new rope is suspended just off the ground on a large pipe or other device. Then, the end of the new rope is run over the point sheave on the end of the boom, down the boom and attached to the crane spool. The rope is then slowly wound onto the spool with one worker standing near the crane and using a hammer to tap each loop of the first layer in place to ensure it is placed tightly against the previous loop. Another worker stands on the ground next to the spool and uses a board or other object between the spool and the ground as a brake, to maintain tension on the rope. No worker stands on the crane's boom with this method of rope replacement.

Lamb brought suit against Manitowoc and several other defendants. All defendants except Manitowoc were dismissed prior to trial, without any settlements. Lamb alleged Manitowoc had defectively designed the crane and that they had negligently failed to warn users of the risks and dangers of stringing wire rope onto the drum of the crane. The jury found in favor of defendants on the design defect claim and returned a verdict for Lamb on the failure-to-warn claim. The jury awarded $243,000 in damages, but assessed fifty percent of the fault to Lamb. Following trial, defendants filed a motion for judgment notwithstanding the verdict. The district court denied the motion and it is from that ruling that defendants appeal.

On appeal, defendants argue that the district court erred in denying their motion for judgment notwithstanding the verdict on two grounds. First, they argue that Lamb failed to establish defendants had a duty to warn. Second, defendants argue Lamb failed to prove that the defendants' alleged failure to warn or instruct as to the proper method for rope replacement was the proximate cause of his injuries.

II. Scope of Review

A motion for judgment notwithstanding the verdict pursuant to Iowa Rule of Civil Procedure 243 must stand on the grounds raised in the movant's motion for directed verdict. *Watson v. Lewis*, 272 N.W.2d 459, 461 (Iowa 1978). On appeal from denial of a motion for judgment notwithstanding the verdict, review is limited to the grounds raised in the movant's directed verdict motion. *Id.* Our examination of the transcript and appendix shows that Manitowoc raised both issues it has raised on appeal in its directed verdict motion at the close of plaintiff's case and again at the close of plaintiff's rebuttal case, as well as in its motion for judgment notwithstanding the verdict. Thus, both issues were properly preserved for appeal.

In reviewing denial of a motion for judgment notwithstanding the verdict, we consider whether the evidence, when viewed in the light most favorable to the nonmoving

party, shows that the movant was entitled to a directed verdict at the close of all the evidence. *McGough v. Gabus,* 526 N.W.2d 328, 334 (Iowa 1995); *Crow v. Manitex, Inc.,* 550 N.W.2d 175, 177 (Iowa App.1996). When reviewing the district court's decision on such a motion, we look to see whether the evidence on an issue was sufficient to generate a jury question. *Id.* "[I]f there is no substantial evidence in support of each element of plaintiff's claim, a directed verdict or judgment notwithstanding the verdict in defendants' favor is appropriate." *Valadez v. City of Des Moines,* 324 N.W.2d 475, 478 (Iowa 1982); *see also Dennett v. City of Des Moines,* 347 N.W.2d 691, 692 (Iowa App. 1984) (same). However, if reasonable minds could differ on an issue when the evidence is viewed in the light most favorable to the nonmoving party, then it was appropriate to submit the issue to the jury and the jury's verdict should be upheld. *Dennett,* 347 N.W.2d at 692.

### III. Failure to Warn

We first consider Manitowoc's contention that Lamb failed to raise a jury issue on his failure-to-warn claim and whether defendants' motions for a directed verdict or judgment notwithstanding the verdict should have been granted by the district court.

■ Our court has adopted the standard set forth in section 388 of the Restatement (Second) of Torts for determining whether a manufacturer or supplier of goods has fulfilled its duty to warn of a product's dangerous propensities. *See West v. Broderick & Bascom Rope Co.,* 197 N.W.2d 202, 209 (Iowa 1972) (stating that the modern rule regarding the duty to warn is stated accurately by the Restatement). The section states as follows:

Chattel Known to be Dangerous for Intended Use

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier

(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Restatement (Second) of Torts § 388 (1965). While section 388 deals specifically with suppliers of chattels, section 394 subjects manufacturers to the same liability. *Id.* § 394. We have previously stated a claim alleging that a manufacturer failed to warn of the dangers involved in using a product is properly based on a theory of negligence, not strict liability. *Olson v. Prosoco, Inc.,* 522 N.W.2d 284, 289 (Iowa 1994).

■ Our court has held that the duty to warn is based upon superior knowledge of the manufacturer or supplier as to the dangers a certain product poses. *Beeman v. Manville Corp. Asbestos Disease Comp. Fund,* 496 N.W.2d 247, 252 (Iowa 1993); *see also Anderson v. Glynn Constr. Co.,* 421 N.W.2d 141, 145 (Iowa 1988) (recognizing that superior knowledge is an important element in the application of section 388). A duty to warn exists when a party "reasonably foresee[s] a danger of injury or damage to one less knowledgeable unless an adequate warning is given." *Beeman,* 496 N.W.2d at 252 (citing *Lakatosh v. Diamond Alkali Co.,* 208 N.W.2d 910, 913 (Iowa 1973)). Thus, reasonable foreseeability of danger to users of a product triggers the duty to warn. A manufacturer has no duty to warn when it did not or should not have known of the danger. *Moore v. Vanderloo,* 386 N.W.2d 108, 116 (Iowa 1986).

■ Turning to the first element of the duty-to-warn claim, we must determine whether Lamb raised a jury issue regarding whether Manitowoc knew or had reason to know that changing the wire rope was likely to be dangerous, thus triggering a duty to warn. Examining the evidence adduced at trial, we find that the evidence was insufficient to show that Manitowoc knew or had

reason to know of dangers arising from the stringing of wire rope. The chance of injury occurring while stringing wire rope was not foreseeable to defendants and therefore, they had no duty to warn.

▮ Our court of appeals has noted that evidence of "the absence of accidents ... with the same instrumentality under substantially similar circumstances [is] probative of the absence of danger or lack of knowledge of the danger by the defending party." *Rattenborg v. Montgomery Elevator Co.,* 438 N.W.2d 602, 606 (Iowa App.1989) (citing *Schuller v. Hy–Vee Food Stores,* 328 N.W.2d 328, 330 (Iowa 1982); *Wiedenfeld v. Chicago & N.W. Transp. Co.,* 252 N.W.2d 691, 700 (Iowa 1977); *Nelson v. Langstrom,* 252 Iowa 965, 970, 108 N.W.2d 58, 61 (1961)).

The evidence showed that very few injuries have been sustained throughout the iron-working and crane operating industries during the changing of wire rope. Manitowoc's experts testified that the world-wide crane manufacturing industry was unaware of anyone being seriously injured while replacing wire rope prior to the plaintiff's accident. Manitowoc had never received any type of communication or claim from any of its users regarding an injury that occurred while stringing wire rope. Manitowoc's experts testified that the possibility of danger involved in wire rope replacement has never been a concern of crane manufacturers because of the lack of reported injuries. The testimony revealed that no crane manufacturer provided warnings or instructions regarding the replacement of wire rope prior to Lamb's injury.

It is important to note that Manitowoc was not unaware of the dangers involved in the general operation of cranes. Nor was it lax in providing warnings regarding dangers of which it had knowledge. The crane in question bore two decals describing the danger involved in standing on or near the crane while it was in operation. These warnings stated: "Danger! To prevent bodily injury, stay clear of machine while engine is running."

While Lamb's experts and coworkers testified to several injuries that had occurred during the replacement of wire rope, those were minor injuries that were the result of the weight of the rope (*i.e.* muscle strains, back injuries, an injured toe) or the condition of the rope (*i.e.* hand injuries from burrs on the rope). None of the injuries testified to during trial arose from dangers particular to the crane's role in wire rope replacement. Furthermore, none of those minor injuries involved Manitowoc cranes. Lamb's experts also testified regarding the potential for injuries during the rope replacement process. One expert listed possible injuries, such as slipping and falling or catching clothing or a body part in moving machinery. However, no evidence was introduced that those types of injuries had actually occurred. In addition, those types of injuries would only occur while using the method employed by Lamb's coworkers, when a worker is required to stand on the boom of the crane while replacing the rope.

The instant case can be distinguished from *Beeman,* an asbestos litigation case, in which we upheld a jury verdict in favor of plaintiffs. In *Beeman,* the plaintiffs introduced substantial evidence which established that experts in the asbestos industry knew prior to some or all of Beeman's exposure to asbestos that certain lung problems were clearly connected to asbestos exposure. *Beeman,* 496 N.W.2d at 250. We noted that the knowledge of those experts was relevant to the issue of whether the defendant-manufacturers knew of the dangers associated with asbestos. *Id.* at 252. Lamb argues that because its expert testified to previous minor injuries and the potential for other types of injuries, defendants should have known of the dangers involved in stringing wire rope. However, the instant case does not involve circumstances similar to *Beeman.* In *Beeman,* the defendants had knowledge of a substantial risk of injuries similar to Beeman's. The evidence showed that defendants in the instant case had no knowledge of prior injuries and there are no prior injuries which suffice to establish industry knowledge of the dangers associated with wire rope replacement which can be imputed to defendants.

Based on this evidence it is impossible for this court to conclude that a reasonable jury could find Lamb proved defendants were ac-

70

tually aware of prior injuries arising from wire rope replacement. Neither is it possible to conclude that a reasonable jury could find that defendants should have known of the potential for injury, in the absence of evidence of any similar injuries associated with wire rope replacement. The evidence detailed above indicates that Lamb failed to raise a jury issue with regard to whether Manitowoc had superior knowledge of the dangers involved in wire rope replacement.

Because there was no evidence from which a jury could have concluded that Manitowoc knew or had reason to know of any danger involved in the replacement of wire rope, there is no need to address the other elements of the failure-to-warn claim. Failure to raise a jury issue with regard to one of the elements is sufficient to grant defendants' motion for judgment notwithstanding the verdict. *See Valadez,* 324 N.W.2d at 477–78. We reverse the district court's decision to deny defendants' motion for judgment notwithstanding the verdict and remand the case for entry of judgment in favor of defendants.

**REVERSED AND REMANDED.**