**Roger J. BERGFELD, Sr., Denice I. Bergfeld Plaintiffs,**

v.

**UNIMIN CORPORATION, and Lockheed–Martin Corporation, Defendants.**

**No. C97–1030–MJM.**

United States District Court, N.D. Iowa, Dubuque Division.

April 8, 2002.

---

972

Todd J. Locher, Locher & Locher, Farley, IA, Michael B. Martin, Maloney, Martin & Mitchell, LLP, Houston, TX, for plaintiffs.

Larry J. Thorson, Ackley, Kopecky & Kingery, LLP, Cedar Rapids, IA, Francis A. Citera, pro hac vice, Greenberg, Traurig, LLP, Chicago, IL, Lisa Harris, pro hac vice, Greenberg & Traurig, PA, Orlando, FL, for defendant.

## ORDER

MICHAEL J. MELLOY, Circuit Judge, sitting by designation.

Before the court is defendant[1] Lockheed–Martin Corporation's motion for summary judgment on all counts of plaintiffs Roger and Denice Bergfeld's first amended and substituted complaint. Oral arguments were held on December 17, 2001, regarding all pending motions. Count I of plaintiffs' complaint claims a failure to warn, Count II claims strict liability, Count III claims negligence, and Count IV claims loss of consortium. For the following reasons, defendant Lockheed–Martin's motion for summary judgment on all counts is granted.

1. Pursuant to a stipulation of dismissal entered into by all the parties, Unimin Corporation was dropped from the suit. (Doc. No. 71).

## STANDARD OF REVIEW

The standard for granting summary judgment is well established. A motion for summary judgment may be granted only if, after examining all of the evidence in the light most favorable to the nonmoving party, the court finds that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Montgomery v. John Deere & Co.,* 169 F.3d 556, 559 (8th Cir. 1999). Rule 56(c) of the Federal Rules of Civil of Procedure provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Particularly relevant in this case is the fact that

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to a judgment

as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548.

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548 (quoting Fed. R. Civ. Pro. 56(c)). Once the moving party has carried its burden the opponent "must do more than simply show that there is some metaphysical doubt as to the material facts[,]" that is, the opponent must go beyond the pleadings and designate specific facts that show there is a genuine issue for trial. *Matsushita Electric Industrial Co. Ltd.,* 475 U.S. at 586, 106 S.Ct. 1348 (internal citations omitted) (footnote omitted). The opponent may use such methods as affidavits, depositions, answers to interrogatories, and admissions on file to show the court there is indeed a genuine issue for trial. Fed.R.Civ.P. 56(e). The evidence of the nonmoving party is to be considered as true, and justifiable inferences arising from the evidence are to be drawn in his or her favor. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

## FACTS

Plaintiffs Roger and Denice Bergfeld are residents of Dubuque, Iowa. Defendant Lockheed–Martin Corporation[2] is a Dela-

---

**2.** On March 15, 1995, Lockheed Corporation and Martin Marietta Corporation merged in an agreement by which both Lockheed and Martin Marietta became wholly-owned subsidiaries of a new holding corporation, Lock-

heed–Martin Corporation. All references will be to Lockheed–Martin Corporation regardless of whether the reference is before Lockheed–Martin was formed. In January of 1996, Martin Marietta ceased to exist.

ware corporation. The parties are before the court on diversity jurisdiction. Plaintiff Roger Bergfeld suffers from silicosis, a lung disease caused by excessive exposure to respirable silica.[3] Plaintiffs claim the defendant Lockheed–Martin is responsible for Roger Bergfeld's silicosis because Lockheed–Martin supplied industrial sand[4] in bulk to Bergfeld's employer, John Deere Dubuque Works Foundry [hereinafter Dubuque Works Foundry or John Deere]. Plaintiff Roger Bergfeld was an employee of the Dubuque Works Foundry from March 20, 1972, until it closed in approximately February of 1987. Bergfeld continued his employment with John Deere until his retirement in March of 1999. Bergfeld alleges Lockheed–Martin was negligent in failing to warn his employer of the potential risks of exposure to industrial sand at levels below the Occupational Safety and Health Administration's permissible exposure limits (OSHA PEL). Plaintiffs contend Lockheed–Martin had a duty to notify the Dubuque Works Foundry of a lower recommended exposure limit issued by the National Institute of Occupational Safety and Health (NIOSH REL).

Defendant Lockheed–Martin sold industrial sand to plaintiff Roger Bergfeld's employer, the Dubuque Works Foundry. While employed at the Dubuque Works Foundry, Roger Bergfeld occupied several jobs. Bergfeld was a sampler and tester of molds from March 1972 to March 1973; a telpher car operator (transferring molten iron from the furnace to the various production lines) from March 1973 to December 1982; a cupola operator (melting the iron) from December 1982 to March 1986; and again as a telpher car operator from March 1986 to February 1987.

The Dubuque Works Foundry purchased its industrial sand from two Lockheed–Martin sand facilities located in Clayton, Iowa, and Oregon, Illinois, between the years 1976 through 1983. In 1976, Lockheed–Martin shipped 56.9 tons of industrial sand from its Clayton, Iowa, facility to the Dubuque Works Foundry. In 1978, Lockheed–Martin shipped 32,-149.69 tons of industrial sand from its Clayton, Iowa, facility to the Dubuque Works Foundry. In 1979, Lockheed–Martin shipped 32.9 tons of industrial sand from its Clayton, Iowa, facility to the Dubuque Works Foundry. In 1982, Lockheed–Martin shipped 637.14 tons of industrial sand from its Oregon, Illinois, facility to the Dubuque Works Foundry[5]. Lockheed–Martin closed the Clayton, Iowa, facility in 1981 or 1982. Lockheed–Martin slowly sold off its industrial sand operations, selling the Oregon, Illinois, plant to Unimin Corporation in 1983. Lockheed–Martin sold its final industrial sand facility in Wedron, Illinois, to Wedron Silica Company, an Ohio corporation, on July 31,

---

**3.** Lockheed–Martin disputes the diagnosis, but for purposes of summary judgment, the court examines the facts in a light more favorable to the nonmoving party, in this case, the plaintiff. So, for purposes of this motion, the court accepts the plaintiffs' diagnosis that he does indeed have silicosis.

**4.** Industrial sand, or silica sand, are the names commonly used to refer to crystalline silica. The material is used in various foundry operations. When used, it produces silica dust that becomes airborne and is a threat to foundry employees working in the exposed area.

**5.** Prior to 1982, Lockheed–Martin included a warning on bags of industrial sand. Beginning in 1982, Lockheed–Martin placed the following warning, measuring 3.5″ × 5″, about silicosis on invoices and bills of lading for the industrial sand purchased by Deere:

> Caution: Industrial sand contains free silica. Inhalation of the dust from industrial sand may cause delayed lung injury (silicosis). Care should be used and measures taken to prevent or minimize inhalation of the dust from industrial sand.

1984, which divested Lockheed–Martin of all of its interests in supplying industrial sand to the Dubuque Works Foundry.

When operating the sand facilities, Lockheed–Martin hydraulically mined and washed the sand. Hydraulic mining included the use of a high-pressured hose to break the sandstone up, after which the sand was vacuumed up, washed, and then moved to a stacking operation to drain the water. The sand was then dried and put through a screening and grading process, moved to silos sorted by grade, and finally shipped out to purchasers.

Industrial sand, or crystalline silica, was used in the Dubuque Works Foundry to fabricate molds and cores for metal castings and parts to be used in John Deere's farm and industrial equipment. The sand arrived at the Dubuque Works Foundry by railcar or semi tractor-trailer. Once at the Dubuque Works Foundry, the sand was moved by way of conveyors located above and below the ground. Plaintiff Roger Bergfeld did not order or purchase the sand, did not unload the sand when it arrived at the Dubuque Works Foundry, did not have responsibility for mixing the sand that was to be used for making the molds, did not make the molds or cores, and did not operate a sand muller.

When the sand is used in the manufacturing process, it typically fractures into fine particles and becomes airborne. This is where the risk of contracting silicosis lies. Silicosis, an occupational disease, is caused by excessive exposure to and inhalation of the crystalline silica used in foundry operations. The airborne silica particles become trapped in the lungs. The lung tissue develops fibrotic nodules and scarring around the trapped silica particles. If the nodules grow, breathing becomes laborious as the lungs' capacity to absorb and process oxygen is diminished.

Symptoms of silicosis include shortness of breath, fever, and bluish skin.

The Department of Labor's Occupational Safety and Health Administration (OSHA) standards have a permissible exposure limit (PEL) for silica of 100 micrograms per cubic meter, or .1 milligrams per cubic meter over a time weighted average of eight hours. 29 C.F.R. § 1910.1000 (2001)[6]. OSHA is the federal agency which promulgates regulations regarding the occupational environment. Employers are charged with furnishing for their employees a safe working environment free from recognized hazards and in compliance with the occupational safety and health standards promulgated by OSHA. 29 U.S.C. § 654(a)(1)-(2). The National Institute of Occupational Safety and Health (NIOSH), an agency of the Department of Health and Human Services, is charged with "develop[ing] and establish[ing] recommended occupational safety and health standards[.]" 29 U.S.C. § 671(c)(1). Unlike OSHA standards, NIOSH recommendations are not binding on employers. NIOSH standards have a recommended exposure limit (REL) for silica of 50 micrograms per cubic meter, up to a 10 hour workday, 40 hours per week, over a working lifetime, or approximately half the limit required by the OSHA PEL. Plaintiffs admit that Roger Bergfeld was never exposed to silica above the OSHA PEL. Plaintiffs contend that defendant Lockheed–Martin should have advised the plaintiff and his employer about the NIOSH REL for silica, not just the OSHA PEL, and that defendant's failure to do so resulted in plaintiffs' injuries.

John Deere maintained an Industrial Hygiene Department that was responsible for ensuring compliance with OSHA, and its state of Iowa counterpart-IOSHA, regulations. Among other tasks, the Industrial Hygiene Department monitored the air

---

**6.** This regulation has been in effect since 1972.

quality in the Foundry, conducted safety audits of the Foundry, and researched products and materials employed in the operations of the Foundry. Employees of the Industrial Hygiene Department were responsible for staying current on occupational safety and health issues and sharing the information with John Deere management.

Count I of plaintiffs' complaint claims Lockheed–Martin failed to warn Roger Bergfeld of the dangers posed by the use of silica sand. Count II seeks to hold Lockheed–Martin strictly liable for Roger Bergfeld's silicosis because the industrial sand supplied by Lockheed–Martin was defective and unreasonably dangerous. Count III claims negligence on the part of Lockheed–Martin for failing to properly inspect or test its products; failing to properly process its products so as to minimize the defective and unreasonably dangerous properties of the products; and failing to provide adequate and effective instructions for the safe use and handling of its products. Count IV claims loss of consortium due to Roger Bergfeld's silicosis depriving plaintiff Denice Bergfeld of his aid, services, support, affection, society, and companionship.

### ANALYSIS

■ The issue permeating much of this motion for summary judgment is whether Lockheed–Martin owed a duty to plaintiff Roger Bergfeld, an employee of the Dubuque Works Foundry[7]. The determination of whether a duty is owed is a question of law. *Lovick v. Wil–Rich*, 588 N.W.2d 688, 696 (Iowa 1999). Because any duty Lockheed–Martin may have owed plaintiffs is circumscribed by the court's determination that John Deere was a sophisticated user, plaintiffs' claims on Counts I and III are without merit. Count II also fails because a claim for strict liability cannot stand against a mere supplier of a raw material. Consequently, the claim for loss of consortium by Denice Bergfeld under Count IV fails because Lockheed–Martin, as a matter of law, is not liable to the plaintiffs.

### Failure to Warn

■ In Count I, plaintiffs assert that Lockheed–Martin failed to warn Roger Bergfeld of the risk of silicosis, and, more specifically, that Lockheed–Martin failed to warn John Deere of the risks from exposure to silica dust below the OSHA PEL. Under Iowa law, "[a] claim alleging a manufacturer failed to warn of the dangers involved in using a product is properly based on a theory of negligence, not strict liability." *Mercer v. Pittway Corp.*, 616 N.W.2d 602, 623 (Iowa 2000) (citing *Lamb v. Manitowoc Co.*, 570 N.W.2d 65, 68 (Iowa 1997)); *see also Olson v. Prosoco,*

7. Plaintiffs have moved to exclude the affidavit of Charles Peterson (Doc. No. 79), a particularly key figure in the John Deere Industrial Hygiene Department, and consequently, in the court's duty analysis. Charles Peterson was an industrial hygienist for Deere from 1956 to 1967, a safety representative from 1968 to 1970, and then served as Manager of Industrial Hygiene until his retirement in 1992. Peterson's name came up frequently during deposition testimony of various witnesses. Plaintiffs seek to exclude Peterson's affidavit and ask that he be stricken as a witness in this case because Lockheed–Martin failed to disclose Peterson's identity and whereabouts during discovery requests. Peterson's affidavit is dated July 20, 2001, and was filed along with Lockheed–Martin's motion for summary judgment on July 30, 2001. The court denies plaintiffs' motion to exclude the Peterson affidavit. Plaintiffs were aware of his existence and his role at the John Deere. Defendant located the affiant and has included his statement in the record which the court accepts. Defendant's conduct does not abuse the judicial process, but likely, more accurately reflects the difficulty of litigating a case in which the evidence, the relevant players, the issue and the litigation are temporally distant.

*Inc.*, 522 N.W.2d 284, 289 (Iowa 1994) ("We believe that the correct submission of instructions regarding a failure to warn claim for damages is under a theory of negligence and the claim should not be submitted as a theory of strict liability."). Consequently, under a theory of negligence the defendant must have owed a duty to the plaintiff. In the context of a failure to warn, the duty exists when, first, the supplier possesses superior knowledge of the danger a product poses, and, second, the danger is reasonably foreseeable. *Lamb*, 570 N.W.2d at 68 ("[T]he duty to warn is based upon superior knowledge of the manufacturer or supplier as to the dangers a certain product poses.").

"[Iowa] ha[s] adopted the standard set forth in section 388 of the Restatement (Second) of Torts for determining whether a manufacturer of goods has fulfilled its duty to warn of a product's dangerous propensities." *Id.* Section 388 of the Restatement (Second) of Torts, states:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

■ "Subsection (b) of this test has been interpreted to mean that there is no duty to warn if the user knows or should know of the potential danger, especially when the user is a professional who should be aware of the characteristics of the product." *Strong v. E.I. DuPont de Nemours Co.*, 667 F.2d 682, 687 (8th Cir.1981) (citations omitted). Subsection (b), then, embodies what is known as the sophisticated user doctrine:

> This rule of the 'sophisticated user' is no more than an expression of common sense as to why a party should not be liable when no warnings or inadequate warnings are given to one who already knows or could reasonably have been expected to know of the dangers of [the product]. Otherwise, it would be an effort to shift liability to one who had no duty to act. We expect the law in ordinary circumstances to apply a common sense rule.

*Crook v. Kaneb Pipe Line Operating P'ship, L.P.*, 231 F.3d 1098, 1102 (8th Cir. 2000). In *Vandelune v. 4B Elevator Components Unlimited*, 148 F.3d 943, 946 (8th Cir.1998), the Eighth Circuit, in applying Restatement Section 388 under Iowa law, concluded that the supplier does not have a duty to warn if the user appreciates the risk involved in the use of the product and if it is familiar with the product: " 'There is no duty to warn if the user knows or should know of the potential danger, especially when the user is a professional who should be aware of the characteristics of the product.' " *Vandelune*, 148 F.3d at 946 (applying Restatement Section 388 under Iowa law) (quoting *Strong*, 667 F.2d at 687 (applying Restatement Section 388 under Nebraska law)); *see also Stoffel v. Thermogas Co.*, 998 F.Supp. 1021, 1027 (N.D.Iowa 1997) ("While the Iowa Supreme Court has not explicitly approved the 'bulk supplier' [or 'sophisticated user'] defense by name, ... this Court concludes that the Iowa Supreme Court has in fact adopted that defense.").

■ Lockheed–Martin's argument that it had no duty to warn based on the sophisticated user doctrine is persuasive. The record conclusively demonstrates that John Deere, through its Industrial Hygiene Department, had long been aware of and took steps to ameliorate the risk of silicosis to its employees. In that regard, Deere followed OSHA regulations relating to the exposure limits to silica dust, even though Deere was aware of the lower level of exposure under the NIOSH REL. (*See* Defendant's Appendix p. 9, Affidavit of Charles Peterson, John Deere Manager of Industrial Hygiene, ¶¶ 38–41; Defendant's Appendix p. 182–83, Deposition of Ken Oestentad, John Deere Industrial Hygienist, pp. 151, 153.). The risks associated with the use of silica sand were obvious and well-documented, even before NIOSH issued its REL in 1974 [8]. (*See* Deere Industrial Hygiene Survey, Defendant's Appendix p. 270). John Deere was aware of the risks prior to the NIOSH *recommending* a lower exposure level. (*See* Defendant's Appendix, Affidavit of Charles Peterson, John Deere Manager of Industrial Hygiene, ¶¶ 38–41.) In fact, Deere had extensive knowledge and conducted evaluations of the risks created by silica dust. (*See* Deere Industrial Hygiene Survey, Defendant's Appendix p. 270.) As a result of the safety audits and industrial hygiene surveys, John Deere was knowledgeable of the risks associated with industrial sand and took steps to lessen the exposure to silica dust.

Furthermore, Lockheed–Martin's position finds support in comment n to Section 388, which states in part: "Modern life would be intolerable unless one were permitted to rely to a certain extent on others doing what they normally do, *particularly if it is their duty to do so.*" Restatement (Second) of Torts, § 388, cmt. n (emphasis added). Iowa has adopted comment n to Section 388. *West v. Broderick & Bascom Rope Co.,* 197 N.W.2d 202, 211 (Iowa 1972). Lockheed–Martin's duty, if any, does not survive in tort analysis after the court's determination that John Deere is a sophisticated user charged with protecting its employees. *See Smith v. Walter C. Best, Inc.,* 927 F.2d 736, 739–40 (3d Cir. 1990) (affirming application of district court's entry of summary judgment in favor of bulk sand supplier under the principles of Section 388) (citing *Goodbar v. Whitehead Brothers,* 591 F.Supp. 552, 557 (W.D.Va.1984)). John Deere was obligated to provide a safe workplace for its employees, and as an employer, it was in a far better position to ascertain who was at risk of exposure to silica dust and to warn those individuals. *See Goodbar,* 591 F.Supp. at 562 ("[T]he Defendant suppliers could reasonably assume that the Foundry had substantial expertise in this area and that it would perform its legal obligations as well as protecting its own financial interest."). A contrary conclusion would put an onerous burden on a party in the defendant's position and would, in effect, extend the duty of a bulk supplier beyond what the law permits. One court has enumerated some of the more obvious problems associated with imposing such a duty on a party in the defendant's position.

(1) [T]he identification of the users or those exposed to its products would require a constant monitoring by the suppliers in view of the constant turnover of the Foundry's large work force; (2) the manner in which the sand products are delivered in bulk (i.e. unpackaged railroad car lots or truck); (3) no written

---

**8.** Deere's knowledge of silicosis was not, it appears, recently acquired. Deere has dealt with the occupational disease of silicosis long before plaintiff's employment. *See Burt v. John Deere Waterloo Tractor Works,* 247 Iowa 691, 73 N.W.2d 732 (Iowa 1955) (addressing workers' compensation claim for employee's alleged silicosis).

product warnings placed on the railroad cars would ever reach the workers involved in casting or those in the immediate vicinity due to the way the loose sand is unloaded, conveyed, and kept in storage bins until needed; (4) only the Foundry itself would be in a position to provide the good housekeeping measures, training and warnings to its workers on a continuous and systematic basis necessary to reduce the risk of silicosis; (5) the sand suppliers must rely on the Foundry to convey any safety information to its employees; (6) the confusion arising when [multiple suppliers] and the Foundry each try to cope with the awesome task of instructing the Foundry workers; and (7) in a commercial setting, it would be totally unrealistic to assume that the suppliers would be able to exert pressure on a large, industrial customer such as the Foundry to allow the suppliers to come in and educate its workers about the hazards of silicosis.

*Id.* at 566.

■ There is substantial evidence in the record indicating John Deere appreciated the dangers posed by industrial sand. (*See* Defendant's Appendix p. 270, Deere Industrial Hygiene Survey.) John Deere has been aware of silicosis since the 1950s. (*See* Defendant's Appendix, Affidavit of Charles Peterson ¶ 39.) John Deere had

medical doctors and nurses on staff to regularly screen and monitor employees' health. John Deere monitored the level of airborne silica in the Dubuque Works Foundry. John Deere had a respirator program prior to 1972, and since then provided a respirator to individuals exposed to silica levels above the OSHA PEL. Plaintiff contends that because John Deere policy was to not provide respirators to employees exposed to silica below the OSHA PEL, they were not aware of the risks of silica exposure below the OSHA PEL. Such a proposition belies the evidence. The evidence establishes that John Deere knew of the NIOSH REL, but that it did not change its policy and chose not to adhere to the NIOSH REL. As a recommendation, and not a regulation, it was perfectly permissible for John Deere to so do. John Deere evaluated the recommendations and implemented the ones it believed were based on sound and accepted scientific research. The Industrial Hygiene Department had information on and an awareness of the hazards of exposure to silica dust from the late 1950s on and did not find it necessary to go to or rely upon the sand suppliers for this information.

Under these facts, the court believes that Lockheed–Martin had no duty to warn John Deere regarding the NIOSH REL[9]. Failing this essential element, plaintiffs' claim is without merit. For this

9. Other jurisdictions faced with similar questions have arrived at the same conclusion. The Third Circuit, in affirming entry of summary judgment in favor of a sand supplier, stated:

Based upon the record in this case we believe that it was reasonable for the sand supplier to assume that Valley Mould knew of the dangers of silica given the state of common medical knowledge at all relevant times, the various statutes and regulations governing silica, and the fact that Valley Mould was a member of the Industrial Health Foundation, a non-profit organization providing information to its members relative to occupational diseases (including silicosis) and their prevention. This rea-

sonable assumption of knowledge, coupled with the duty owed by Valley Mould to provide its workers with a safe working environment and the virtual impossibility of the sand suppliers reaching the ultimate users, is, in our view, sufficient to satisfy the Restatement [Section 388] standard and to justify the sand suppliers' reliance on Valley Mould, as a knowledgeable purchaser, to warn the ultimate sand users. The sand suppliers, therefore, owed the [plaintiffs] no duty to warn and summary judgment on the issue of negligent failure to warn was appropriate.

*Smith,* 927 F.2d at 741; *see also Goodbar,* 591 F.Supp. at 566 ("I agree that a sand supplier to a large, knowledgeable foundry like the

reason, Lockheed–Martin's motion for summary judgment on the Bergfelds' claim for failure to warn must be granted.

### Strict Liability

Iowa law retains the distinction between strict liability and negligence in design defects claims. *Lovick*, 588 N.W.2d at 698. The significance of this distinction lies in where the court will focus its attention. In strict liability claims, the court focuses on the condition of the product in dispute. *Id.* at 699. In negligence claims, the court focuses on the conduct of the defendant. *Id.*

Plaintiffs' claim on strict liability is premised on the silica sand, supplied in bulk by Lockheed–Martin, containing harmful properties known to cause serious health problems. Plaintiffs contend that the condition of the sand was defective and unreasonably dangerous, and that Lockheed–Martin, in supplying the sand, intended the sand to be used in the condition it was supplied.

Iowa has adopted section 402A of the Restatement (Second) of Torts, regarding strict liability. *See Mercer*, 616 N.W.2d at 619. Consequently, plaintiffs' strict liability claim will be analyzed under that provision, which reads:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in condition in the way in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement (Second) of Torts, § 402A (1965). The premise, then, is that the product is in a "defective condition unreasonably dangerous to the user." The product at issue-silica sand-is a raw material. The Restatement (Third) of Torts states:

Regarding the seller's exposure to liability for defective design, a basic raw material such as sand, gravel or kerosene cannot be defectively designed. Inappropriate decisions regarding the use of such materials are not attributable to the supplier of the raw materials but rather to the fabricator that puts them to improper use.... Accordingly, raw-materials sellers are not subject to liability for harm caused by defective design of the end-product.

Restatement (Third) Torts § 5 cmt. c (1997). While there is no Iowa case authority adopting this section of the Restatement (Third), the court believes the principles and tenets embodied by this section of the Restatement are consistent with strict liability and Iowa tort law. *See Mercer*, 616 N.W.2d at 619 ("[T]o prove a 'defective condition unreasonably dangerous,' the plaintiff must show that the defect in the product was not one contemplated by the consumer, which would be unreasonably dangerous to the plaintiff in the normal and intended use of the product."); *Fell v. Kewanee Farm Equip. Co.*,

---

Lynchburg Foundry has no duty to warn the foundry employees about the occupational disease of silicosis and its causes when only the Foundry is in a position to communicate effective warning and accordingly should be the one to shoulder any burden of effective warning.").

457 N.W.2d 911, 916 (Iowa 1990) (adopting comment g of Section 402A for definition of defective condition-" '[t]he rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him.' " (quoting Restatement (Second) of Torts (1976) § 402A)).

█ Plaintiffs' claim fails on two fronts. First, the condition of the sand is not unreasonably dangerous, and second, John Deere clearly appreciated the dangers associated with its intended use of the sand. In ascertaining what is unreasonably dangerous, the Iowa Supreme Court has approvingly quoted comment i to Section 402A, *see Fell*, 457 N.W.2d at 916–17, and that comment, placed in context of the sand at issue, has particular relevance and applicability. Comment i states in part: *"The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."* Restatement (Second) Torts, § 402A, cmt. i (1965) (emphasis added). The danger associated with the sand lies in how it is used. As stated under Count I, John Deere understood these dangers and took steps to mitigate the risks. John Deere had a knowledgeable Industrial Hygiene Department that was aware of the literature and science dealing with exposure to silica sand. John Deere had a respirator program for those exposed to silica at or above the OSHA PEL. Even with the knowledge of the NIOSH REL, Deere did not change its policy. It is clear that the danger did not go beyond what John Deere contemplated regarding the use of silica sand.

In sum, the law does not support holding Lockheed–Martin strictly liable for the condition of the raw material, nor does the law support holding Lockheed–Martin liable for how Deere put the raw material to use. In essence, the sand was not "unreasonably dangerous" as that term is contemplated by strict liability case authority. For the foregoing reasons, Lockheed–Martin's motion for summary judgment on plaintiffs' strict liability claim in Count II is hereby granted.

### Negligence

In Count III, plaintiffs contend Lockheed–Martin was negligent in: failing to properly inspect or test its products; failing to properly process or manufacture its products so as to minimize the defective and unreasonably dangerous properties of the products; failing to adequately and effectively warn potential users of its products as to the defective and unreasonably dangerous properties of the products; and failing to provide adequate and effective instructions for the safe use and handling of its products.

█ In its answer, Lockheed–Martin asserted the state-of-the-art defense. In Iowa, when a defendant submits evidence on the state-of-the-art defense on a negligence claim, it goes "to rebut the plaintiff's proof that the defendant breached a duty to exercise the degree of care a reasonable manufacturer would have used in light of generally recognized and prevailing scientific knowledge." *Olson*, 522 N.W.2d at 291. However, the court need not make such a determination because the court concludes that the plaintiffs have failed to establish an essential element of their claim-that Lockheed–Martin owed Roger Bergfeld a duty. Accordingly, Lockheed–Martin's motion for summary judgment on each claim of negligence under Count III is granted.

█ Plaintiffs first contend Lockheed–Martin failed to properly inspect or test its product. The sand is a raw material and the hazards associated with its use were well known to John Deere. In Iowa, a

claim for failure to test arises in two factual scenarios: "[W]here adequate tests for defects are not conducted in production and an article containing a defect is marketed, and where the particular article is not defective but the properties of the product in general are not adequately tested before it is released to the public." *West*, 197 N.W.2d at 212. Under the record developed in this case, the court believes plaintiffs' claim fits into the latter category. *See id.* Accordingly, as the *West* court determined, "[f]ailure to test is not material under the circumstances of this case. For testing to be material, substantial evidence must be introduced of a defect in the article." *Id.* at 212–13. Failing that, "the relevant negligence on [the defendant's] part, if there was negligence, was failure to [warn], not failure to test." *Id.* at 212–13; *see also Schuver v. E.I. DuPont de Nemours & Co.*, 546 N.W.2d 610, 615 (Iowa 1996) ("These allegations of negligence rest upon an alleged improper or inadequate testing or marketing claim. We think this is merely another way of arguing that DuPont's labels should have warned against using [the product] in O'Brien County."). The court has determined that the sand is not defective. Reducing plaintiffs' claim to a failure to warn, the court again finds that under these facts, defendant's duty was abrogated by Deere's status as a sophisticated user. Accordingly, Lockheed–Martin's motion for summary judgment on the failure to test under Count III is granted.

The remaining claims of negligence fail for reasons already discussed at length in the court's analysis of Counts I and II. Plaintiffs' claim for failing to properly process or manufacture its products so as to minimize the defective and unreasonably dangerous properties of the products is merely a recitation of the strict liability claim under Count II. As explained therein, the court concludes sand is not a defective or unreasonably dangerous product.

Plaintiffs allege that Lockheed–Martin failed to properly manufacture its product in a manner that minimized the unreasonably dangerous properties. "A product is unreasonably dangerous if the defect is not ' "one contemplated by the user or consumer which would be unreasonably dangerous to him in the normal and intended use or consumption thereof." ' " *Weyerhaeuser Co.*, 620 N.W.2d at 828 (quoting *Bredberg v. Pepsico, Inc.*, 551 N.W.2d 321, 328 (Iowa 1996) (in turn quoting *Aller v. Rodgers Mach. Mfg. Co.*, 268 N.W.2d 830, 834 (Iowa 1978))). As stated under Counts I and II, the evidence indicates John Deere knew of the risks associated with the use of silica sand when used for its intended purpose. John Deere had programs available for individuals exposed to respirable silica. Accordingly, plaintiffs' claim under this theory of negligence fails.

Plaintiffs' negligent failure to warn claim also fails. As the court's analysis of Count I details, Lockheed–Martin did not owe a duty to John Deere, let alone Roger Bergfeld, whom it could not reasonably ascertain as someone that might be exposed to the risks associated with silica sand. This reasoning also applies to plaintiffs' claim that Lockheed–Martin failed to adequately and effectively instruct workers for the safe use and handling of its products. John Deere's status as a sophisticated user, and the knowledge that confers that status, abrogates any duty that may have been owed plaintiff.

### Loss of Consortium

Plaintiff Denice Bergfeld claims loss of consortium under Count IV. The individual suffering the loss of a spouse's aid, services, support, companionship, and affection has a loss of consortium claim under Iowa law. *See Madison v. Colby*, 348 N.W.2d 202, 209 (Iowa 1984) ("The deprived spouse, not the injured

person, has the right to sue for and recover for the pre-death loss of consortium."). "It is well established that consortium is the separate property right of each spouse; it is an independent, nonderivative claim." *Huber v. Hovey*, 501 N.W.2d 53, 57 (Iowa 1993). However, the tort of loss of consortium cannot lie against a defendant when, as a matter of law, the defendant is not liable to the plaintiffs. *See James v. Burlington Northern, Inc.*, 587 N.W.2d 462, 464–65 (Iowa 1998) (dismissing plaintiff's loss of consortium claim against defendant after defendant held not liable). Having determined that, as a matter of law, Lockheed–Martin is not liable to Roger Bergfeld, the legal consequence for plaintiff Denice Bergfeld is that the action for loss of consortium in Count IV cannot be prosecuted against Lockheed–Martin. Plaintiff Roger Bergfeld's claims against Lockheed–Martin do not survive the motion for summary judgment, and consequently plaintiff Denice Bergfeld's claim for loss of consortium also fails.

## CONCLUSION

The record and governing law indicate there is no genuine issue of material fact. "Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of person opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial,

that the claims and defenses have no factual basis." *Celotex Corp.*, 477 U.S. at 327, 106 S.Ct. 2548. Plaintiffs have failed to establish that essential elements of their claims find a basis in fact. Such failure is fatal to plaintiffs' claims and the court is obligated to enter summary judgment in favor of the defendants.[10]

## ORDER

In accordance with this opinion, the Clerk is hereby ORDERED to enter summary judgment in favor of the defendant, Lockheed–Martin, on all Counts. Defendant's motion for summary judgment is hereby GRANTED and all outstanding motions are resolved by this order.

---

**10.** The following motions are rendered moot by the court's entry of summary judgment in favor of defendant on all counts of plaintiffs' complaint, and for the fact that they do not address material facts relevant to the court's entry of summary judgment: Plaintiffs' Motion to Exclude Certain Opinions of Morton Corn, Doc. No. 85; Defendant's Motion to Exclude Plaintiffs' Expert Dale Gumz, Doc. No. 86; Defendant's Motion to Strike Affidavit of Dale Gumz, Doc. No. 92; Defendant's Motion to Strike Portions of Report of Plain- tiffs' Rebuttal Expert Vernon Rose, Doc. No. 99; Plaintiffs' Motion to Strike Testimony of Morton Corn, Doc. No. 103; Defendant's Motion for Expedited Relief, Doc. No. 97; Defendant's Motion In Limine to Exclude Scientific Evidence Created after Lockheed Ceased Selling Sand to Deere, Doc. No. 107; Defendant's Motion In Limine to Exclude Evidence Regarding the Possibility of Lung Transplantation, Doc. No. 108; and Plaintiffs' Motion In Limine, Doc. No. 110.